UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS E. PEREZ,<br><br>    Plaintiff,<br><br>    v.<br><br>CALIFORNIA PACIFIC BANK, et al.,<br><br>    Defendants. | Case No. 13-cv-03792-JD<br><br>**AMENDED ORDER RE SUMMARY JUDGMENT MOTIONS**<br><br>Re: Dkt. Nos. 92, 95 |

    The parties have filed cross-motions for summary judgment. Dkt. Nos. 92, 95. The Court denies defendants' motion, and grants in part and denies in part the Secretary of Labor's motion.

### BACKGROUND

    This case is an enforcement action brought by the Secretary of the United States Department of Labor (the "Secretary") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. At issue is the handling of the California Pacific Bank Employee Stock Ownership Plan (the "Plan"), which was terminated close to three years before this action was initiated while the Bank was under investigation by the Secretary.

    California Pacific Bank (the "Bank"), which is both a named fiduciary and the "Plan Sponsor" for the Plan, is a small, privately-held commercial bank headquartered in San Francisco. Dkt. No. 1 ¶ 16. The Plan itself is named as a defendant "solely to assure that complete relief can be granted," *id.* ¶ 15, but the real targets of the Secretary's action are the Bank and the four individual fiduciaries of the Plan: Richard Chi, Akila Chen, Kent Chen and William Mo.[1] All

---

[1] At the Secretary's request, and with the agreement of defendants, the summary judgment order (Dkt. No. 112) is amended to clarify in this sentence that the Plan is a nominal defendant. The prior order is not changed in any other way.

four of these defendants were members of the Bank's Board of Directors, and Mr. Chi was additionally the CEO of the Bank. *Id*. ¶¶ 17-20.

The complaint alleges four ways in which these Plan fiduciaries "mismanaged Plan assets," causing the Plan to "suffer over $1,392,088 in harm." *Id*. ¶ 6. "First, after deciding to terminate the Plan in 2010, the fiduciaries failed to liquidate and distribute Plan shares as cash in accordance with the Plan Document and with the statutory and regulatory provisions governing the Plan. . . . Second, upon receiving payment on a $132,506 account receivable owned by the Plan in 2011, the fiduciaries diverted a significant portion of that payment to the Bank, which had no claim to this Plan asset. Third, in 2012, the fiduciaries transferred approximately $69,746 worth of Plan assets from the Plan to the Bank again despite the fact that the Bank had no claim to such assets. Finally, over the course of four years from 2007 to 2011, the fiduciaries held Plan assets (cash) in various noninterest bearing accounts owned by the Bank, thereby providing use of those assets to the Bank without charge, and causing the Plan to lose the interest on those assets that the Plan should have otherwise earned." *Id*. ¶¶ 6-9.

These factual allegations correspond to the Secretary's four claims for relief (labeled as "counts"), which allege violations of Sections 403, 404 and 406 of ERISA as follows:

| Count | Factual Basis | Alleged ERISA Violations |
|-------|---------------|--------------------------|
| One | Failing to liquidate and distribute shares as cash upon termination | Violations of duties of loyalty, prudence, and compliance with plan documents, ERISA §§ 404(a)(1)(A), (B) and (D) |
| Two | Improperly diverting $132,506 account receivable | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Transfer of plan assets to a party in interest, ERISA § 406(a)(1)(D); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |
| Three | Transferring $69,745.93 in plan assets from the plan to the plan sponsor | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Transfer of plan assets to a party in interest, ERISA § 406(a)(1)(D); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |

| Count | Factual Basis | Alleged ERISA Violations |
|---|---|---|
| Four | Holding plan assets in noninterest bearing accounts at the bank | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |

Dkt. No. 1 ¶¶ 52-80.

Defendants seek summary judgment on Count One only. Dkt. No. 92. The Secretary's cross-motion seeks summary judgment on all four counts. Dkt. No. 95. The Court analyzes the two motions together count by count.

## DISCUSSION

As amended in 2010, Rule 56 of the Federal Rules of Civil Procedure provides that a "party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The current version of Rule 56 changed the federal summary judgment process by authorizing the Court to grant what is sometimes called partial summary judgment to dispose of less than the entire case and even just portions of a claim or defense. *See* Fed. R. Civ. P. advisory committee notes, 2010 amendments; *see also Smith v. State of Cal. Dep't of Highway Patrol*, No. 13-CV-01341-JD, 2014 WL 6985092, at *3 (N.D. Cal. Dec. 10, 2014). Now the Court can, when warranted, selectively fillet a claim or defense without dismissing it entirely. The current version of Rule 56 also emphasizes that the Court "shall" issue summary judgment when warranted by the facts and the law.

The traditional standards for summary judgment remain in place. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id*. at 248-49. To determine whether a genuine dispute as to any material fact exists, a court must view the evidence in the light most favorable to the non-moving party and draw "all justifiable inferences" in that party's favor. *Id*. at 255. A principal purpose of

3

summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party must initially establish the absence of a genuine issue of material fact, which it can do by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. It is then the nonmoving party's burden to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id*. at 323-34. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes -- where the evidence is such that a reasonable jury could return a verdict for the nonmoving party -- over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248.

In determining whether to grant or deny summary judgment, it is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotations omitted). Rather, it is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Id*.

## I. COUNT ONE: FAILURE TO LIQUIDATE AND DISTRIBUTE SHARES AS CASH UPON TERMINATION

On this count, which is based on defendants' failure to liquidate bank shares and distribute them as cash to plan participants upon termination of the Plan, the defendants' own submissions establish the following undisputed and indisputable facts:

1. Section 10.4 of the Plan (as amended and restated effective January 1, 2006) is titled "Termination of Plan" and it states: "Upon termination or partial termination of the Plan and Trust by formal action of the Employer or for any other reason, or if Bank Contributions to the Plan and Trust are permanently discontinued for any reason, each affected Participant shall be 100% vested in his Accounts, and payment to such Participant *shall be made in cash* as soon as practicable after liquidation of the assets of the Trust but not later than one year following the date of termination." Dkt. No. 92-3, Ex. A at 35 (emphasis added).

2. On December 28, 2010, defendants Akila Chan, Kent Chen and William Mo passed a "Resolution to Terminate the California Pacific Bank Employee Stock Ownership Plan by the Plan's Trustees," resolving that "the Plan be terminated as of December 31, 2010" and "the Administrator of the Plan [*i.e.*, defendant Richard Chi] take all

necessary steps to liquidate the assets of the Plan and distribute the Plan assets as required by law." Dkt. No. 92-4, Ex. B.

3. On March 1, 2011, defendant Richard Chi sent a letter to the plan participants informing them of the vote to terminate the Plan and that "[t]he plan assets were rolled over into IRA accounts in the name of each participant in February 2010." Dkt. No. 92-5, Ex. D; *see also* Dkt. No. 92-1 ¶ 10. The letter goes on to say that the participant can request that the Bank "repurchase the Bank's stock rolled over to your IRA account at the fair value of the stock for a 60 day period beginning on [the] date of distribution." Dkt. No. 92-5, Ex. D.

4. Defendant Chi's declaration further states that "[t]he Bank stock held by the Plan was distributed to the individual retirement accounts ('IRA') of the Plan Participants on or about June 24, 2011 . . . ." Dkt. No. 92-1 ¶ 11.[2]

In the face of these undisputed facts, defendants raise two main arguments against liability, in support of their own summary judgment motion and in opposition to the Secretary's. Both arguments are unpersuasive. Defendants' first argument is that they should be not held liable because it was "impossible" for the Bank to liquidate the plan participants' Bank shares. This is because, they say, the Federal Deposit Insurance Corporation ("FDIC") "refused to permit the Bank to repurchase the stock held by the Plan Participants" for the "sole reason" of the Secretary's ongoing investigation and subsequent lawsuit. Dkt. No. 92 at 1. Defendants' own exhibits, however, undermine this argument as a factual matter. Among other things, defendants did not send their first letter to the FDIC requesting permission to repurchase until March 1, 2011, the date on which they had already informed plan participants that distributions would be made (or had already been made) in Bank shares. *See* Dkt. No. 92-5, Exs. D, E. In addition, even assuming the distribution was not actually made until June 2011, a distribution in cash was not "impossible" at that time, either. As of then, the only communication defendants had received from the FDIC rejected the Bank's application as incomplete, and informed the Bank that it must provide information addressing "the requirements of Section 303.241(c) of the FDIC Rule and Regulations . . . before the application can be accepted." *Id.*, Ex. F. The FDIC's first refusal to permit any

---

[2] The Court notes, as the Secretary does, that there is a discrepancy here, between the letter informing plan participants that the assets had already been rolled over in February 2010 (ten months prior to the termination of the Plan) and Mr. Chi's present declaration which states the distribution of shares took place in June 2011. *See* Dkt. No. 95 at 12 n.10. Defendants do not comment on or offer any explanation for this discrepancy, but in any event they nowhere dispute that they distributed Bank shares to the plan participants rather than cash after they terminated the Plan.

5

repurchase because of the Bank's ongoing issues with the Department of Labor did not come until October 13, 2011, months after the Bank had already made the distributions in Bank shares rather than cash. *Id.*, Ex. H.

Defendants next argue that the Plan does not really require distributions to be made only in cash upon termination, despite its express language saying so. Arguing that "each provision of the Plan Document needs to be read in context with one another, rather than in isolation," defendants point to other parts of the Plan that permit distributions to be made in cash or stock, *e.g.*, Section 7.2 (Method of Distribution), which states, "Distribution of a Participant's Bank Stock Account and Other Investments Account may be made entirely in cash unless a Participant elects to receive the distribution in the form of Bank Stock . . . ." Dkt. No. 99 at 2-4. This textual interpretation argument is dead on arrival in the face of an express provision entitled "Termination of Plan," which states, "payment to [each affected] Participant *shall be made in cash* . . . ." Dkt. No. 92-3, Ex. A at 35 (emphasis added). Not only that, even assuming that Section 7.2 could apply, which the Court finds does not, defendants did not give plan participants any opportunity to choose between Bank shares or cash; they simply went ahead and made the distributions in the form of Bank shares.

On this record, the Court finds that there is no genuine issue of material fact on the issue of whether defendants violated ERISA Section 404(a)(1)(D) by failing to act "in accordance with the documents and instruments governing the plan," and the Court grants judgment as a matter of law for the Secretary on that issue. The alleged violations of defendants' duties of loyalty and prudence under ERISA Section 404(a)(1)(A) and (B) require a slightly different analysis, but the Court finds the Secretary is entitled to judgment as a matter of law on those claims as well. Under the "exclusive purpose" rule of Section 404(a)(1)(A), fiduciaries have the duty to act with "complete and undivided loyalty to the beneficiaries," *Freund v. Marshall & Illsey Bank*, 485 F. Supp. 629, 639 (W.D. Wis. 1979), and with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2nd Cir. 1982). Under the so-called "prudence" rule of Section 404(a)(1)(B), the court inquires "whether the trustees, at the time they engaged in the challenged transaction, employed the appropriate methods to investigate and/or

6

1  structure the investment." *Donovan v. Walton*, 609 F. Supp. 1221, 1228 (S.D. Fla. 1985) (quoting

2  *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).

3        The Court concludes that defendants here have failed those standards as a matter of law.

4  The Court finds significant the initial letter defendants sent to the plan participants on March 1,

5  2011, which stated:

> The Trustees of the California Pacific Bank Employee Stock Ownership Plan (the Plan) voted to terminate the Plan effective December 31, 2010. The plan assets were rolled over into IRA accounts in the name of each participant in February 2010. Section 7.6 of the Plan document allows participants the right to request California Pacific Bank (the Bank) repurchase the Bank's stock rolled over to your IRA account at the fair value of the stock for a 60 day period beginning on date of the distribution. After this 60 day period has ended, the Bank will have no further requirement to repurchase stock from your account under the Plan document.
>
> If you wish the Bank to repurchase the stock from your account, please notify the Bank as soon as possible . . . . Federal and State regulatory agencies require the Bank to apply for permission to repurchase the stock from your account. Any distribution will be delayed until such regulatory approval is obtained. It is possible that regulatory approval will be denied and, if such an[] event were to occur, the Bank would be prohibited from repurchasing the stock from your account.

16  Dkt. No. 92-5, Ex. D.

17        The letter is replete with misinformation and on its face communicates to plan participants

18  that they have no right to request the Bank to repurchase their stock at all, since the letter was sent

19  in March 2011, more than a year after the alleged distribution "in February 2010" and well past

20  the "60 day period beginning on date of the distribution." The letter also informs participants that

21  "the Bank will have no further requirement to repurchase stock from your account under the Plan

22  document" after the 60 days. Plan participants are also told that the Bank may be "prohibited from

23  repurchasing the stock from your account" if regulatory approval is denied, and there is no

24  mention of any further recourse participants might have in that event. Keeping in mind that the

25  shares were not publicly tradable (because the Bank is privately held) and that the Plan in fact

26  expressly requires distributions to be made in cash upon termination, the letter shows an utter

27  disregard by defendants for the rights and interests of the participants. Though defendants have

28  submitted evidence that they have now made after-the-fact efforts to help plan participants

United States District Court
Northern District of California

liquidate their Bank shares -- specifically by having Alan Chi, the Senior Credit Officer for the Bank, personally offer to buy back the shares, Dkt. No. 92-1 ¶¶ 23-25 -- that evidence goes to the issue of relief, not liability. There is no genuine dispute as to any material fact that defendants violated their duty of loyalty under ERISA Section 404(a)(1)(A) by distributing Bank shares instead of cash after they terminated the Plan.

On defendants' duty of prudence as well, judgment for the Secretary is warranted. Defendants had not so much as requested permission from the FDIC to repurchase the plan participants' Bank shares when they informed participants that distributions would be made as Bank shares rather than cash. The Court finds as a matter of law that defendants failed to perform their fiduciary responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims," as required by ERISA Section 404(a)(1)(B).

Consequently, the Court grants summary judgment for the Secretary for the ERISA violations alleged in Count One of the Secretary's complaint. The question of relief, however, is a different matter. The complaint alleges that defendants are liable under ERISA Section 409, Dkt. No. 1 ¶ 56, but "ERISA § 409(a) explicitly provides that a fiduciary shall 'restore to [the employee benefit] *plan*' any ill-gotten profits obtained by breaching a fiduciary duty." *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1412 (9th Cir. 1988) (emphasis in original). "This is consistent with ERISA's goal of protecting employee benefit plans as entities." *Id*. It is not clear to the Court what losses, if any, were suffered by the Plan as an entity as a result of defendants' breach, and as the Secretary acknowledges, "the amount of current losses on Count One remains to be shown," especially now that some, and possibly all, participants have apparently been given the opportunity to sell back their shares to Alan Chi. Dkt. No. 95 at 20. The determination of the specific amount of liability is consequently reserved for trial, along with any other appropriate relief that should be granted for this violation.

## II. COUNT TWO: IMPROPERLY DIVERTING $132,506 ACCOUNT RECEIVABLE

On Count Two, the parties agree that the Plan had a $132,506 account receivable at some point and that the Bank ultimately received $81,407.18 of this amount. *See* Dkt. No. 102 at 7. What the parties appear to dispute, however, is whether this $81,407.18 received by the Bank can truly be characterized as a "Plan asset."

The Secretary argues that it must be so, because defendants have made "binding admissions" that "Plan assets included the $132,506 account receivable" at the time of termination in 2010. Dkt. No. 103 at 8-9. With that admission in place, the Secretary says, all the Court needs to know is that the Bank ultimately received $81,407.18 of this amount to conclude that defendants have violated ERISA by making this transfer of a Plan asset from the Plan to the Bank.

All indications are that the $132,506 was a Plan asset. On December 28, 2010, defendants Akila Chan, Kent Chen and William Mo passed a "Resolution to Demand Payment of Book Value Interest in Seclusion Alcalde, LLC." Dkt. No. 102-1, Ex. D. That resolution states that "the undersigned Trustees have a right to demand payment of the $132,506 book value of the Plan's membership interest in Seclusion Alcalde, LLC from Seclusion Alcalde Management, LLC ('SAM') pursuant to that certain Asset Purchase and Sale Agreement entered into as of January 1, 2005 between the Plan and SAM (the 'Agreement')" and resolves that, "prior to the termination of the Plan as of December 31, 2010, the Plan exercise its right under the Agreement to receive payment of the $132,506 from SAM." *Id*.

Mr. Chi's declaration attempts to explain why, despite this characterization of the entirety of the $132,506 account receivable as belonging to the Plan, the Bank could properly take $81,407.18 of it:

> The $132,506 account receivable was treated as a dividend to the Plan because the land that was the basis for the receivable was recorded as a dividend to shareholders, including Plan Participants holdings shares through the Plan. That dividend was then allocated among the Plan Participants based on their respective ownership interest in the Plan. Stated differently, the Plan Participants received that portion of the dividend allocated to the stock they owned. At the time the dividend was issued, most of the stock in the Plan was collateral for the outstanding loans. The stock collateralizing the loans was not owned by any of the Plan Participants. The

9

> unallocated stock collateralizing the loans had been repurchased by the Bank because the principal and interest payments on the loan exceeded the contribution limit established by the Internal Revenue Code. The portion of the dividend allocated to the repurchased stock followed the shares repurchased by the Bank, while the portion of the dividend allocated to the stock owned by the Plan Participants remained in the Plan and was distributed to the Plan Participants. Thus, the Plan Participants received dividends on the stock that they owned. They did not receive dividends on the unallocated stock collateralizing the loans because they did not own that stock. The Plan retained Richardson & Company to determine the appropriate allocation of the dividend to the stock held in the Plan. The Plan Participants ultimately received $35,060.85, and the Bank received $81,407.18, representing a return of the overcontribution to the Plan. . . . The allocation of the $132,506 account receivable was based on the ownership of the Bank stock held by the Plan at the time the account receivable was recorded.

Dkt. No. 102-1 ¶ 10.

There are several problems with this explanation. Defendants have submitted no documents or other evidence relating to the purported repurchase by the Bank of "[t]he unallocated stock collateralizing the loans," or, perhaps more importantly, any agreement between the Bank and the Plan relating to whether that repurchase would encompass any dividends associated with that stock. Certainly, defendants' December 28, 2010 resolution makes no mention that part of the $132,506 might in fact properly belong to the Bank and not the Plan because of repurchases by the Bank of unallocated stock held by the Plan. Defendants have also offered no explanation for how the transfer of the $81,407 from the Plan to the Bank could be made consistent with the Plan document. Some relevant sections appear to be Section 5.3(d), Dividends on Bank Stock, which provides that "[a]ny cash dividends received on unallocated shares of Bank Stock (including any Financed Shares credited to the Unallocated Stock Account) shall be included in the computation of the net income (or loss) of the Trust attributable to the portion of the Plan consisting of an employee stock ownership plan," and Section 7.7, Distribution of Dividends, which provides, "On or before the thirtieth day after the close of each Plan Year the Trustee shall determine whether any or all of the cash dividends received on any Bank Stock, if any, owned by the Plan shall be (i) retained by the Plan and allocated pursuant to Section 4.1, (ii) distributed to each Participant, or (iii) used to make payments on an Exempt Loan."

These appear to be complex issues and Mr. Chi's declaration states that "[t]he Plan retained Richardson & Company to determine the appropriate allocation of the dividend to the stock held in the Plan." Dkt. No. 102-1 ¶ 10. He also specifically states that he "consulted with Brian Nash of Richardson & Company, the accounting firm used by the Bank," and "discussed the fact that the $132,506 dividend would be allocated to the stock held by the Plan," as well as the fact that "the Bank had repurchased a portion of the unallocated stock collaterizing loans made to the Plan . . . [and c]onsequently, the portion of the dividend allocated to the repurchased stock would follow the shares repurchased by the Bank." *Id*. ¶ 8. But defendants have submitted nothing at all from Mr. Nash or Richardson & Company, nor any specific documentation that shows how the calculation for the allocation was made and why it was proper. Instead, the only documents that relate to Mr. Nash in the present record before the Court are two documents from 2003 and 2006, respectively, both of which were submitted by the Secretary. In the document from 2003, Mr. Nash expressly states, "We are not ESOP experts, so we strongly recommend the Bank consult with an ESOP expert to determine the number of shares to allocate for all plan years." Dkt. No. 103-3. In the 2006 document he states, "Although we did not audit the ESOP and had no responsibility for it, we suggested to the Bank that it hire an ESOP administrator . . . ." Dkt. No. 103-4.

On this record, the Court finds that the explanation offered by defendants is without any evidentiary support and rings hollow, and is at best nothing more than "[a] scintilla of evidence or evidence that is merely colorable or not significantly probative." *Addisu*, 198 F.3d at 1134. It is not enough to support a reasonable jury's return of a verdict for defendants, and it is not enough to defeat summary judgment in favor of the Secretary on this count as well. The Court finds that the defendants diverted to the Bank a significant portion ($81,407.18) of the $132,506 account receivable that belonged to the Plan, and by doing so, defendants violated ERISA Sections 403, 404 and 406 as alleged by the Secretary's complaint. On this count, too, the Court defers the issue of the appropriate remedy for trial.

### III. COUNT THREE: TRANSFERRING $69,745.93 IN PLAN ASSETS FROM THE PLAN TO THE PLAN SPONSOR

On the alleged transfer of an additional $69,745.93 in Plan assets from the Plan to the Bank that is the basis for Count Three of the Secretary's complaint, defendants' argument once again is not that they did not make the transfer, but that they were entitled to do so because this money represented an "excess contribution" and was therefore a "return" of money that properly belonged to the Bank. Dkt. No. 102 at 8-9.

The Secretary does not dispute that this might be true as a factual matter, but challenges the Bank's right to take the money back as a matter of timing. Specifically, the Secretary points out in his reply brief that "[a]lthough not cited by defendants, ERISA § 403 does permit the return of excess contributions -- but only if (a) the contributions were the result of a mistake of fact and (b) they are returned within one year after they were made." Dkt. No. 103 at 11 (citing ERISA § 403(c)(2)(A)(i)). The Secretary argues that defendants cannot take advantage of this provision because "the last contribution to the Plan was made in 2006, more than a year before the transfer of the $69,746 took place." *Id*. The Secretary points to a December 29, 2006 letter from Richard Chi, on the one hand, which "notif[ies] the California Pacific Bank ESOP Trustees that effective December 31, 2006 California Pacific Bank will no longer make any contributions towards ESOP," Dkt. No. 103-2, and defendants' amended answer, on the other, which admits that "'approximately $69,746' was transferred 'from the Plan to the Bank' in 2012." Dkt. No. 34 ¶ 8.

On the record before it, however, the Court is unable to determine whether the Bank truly did not make any further contributions to the Plan after December 31, 2006, or what, if any, legal effect the Plan's termination at the end of 2010 may have had on the Bank's clock for permissibly taking back any over-contributions. Defendants also argued at the hearing -- and addressed in a post-hearing brief permitted by the Court -- that "the one-year time limit under ERISA for recovering over-contributions to the Plan was tolled during the time the Bank was under investigation by the IRS and/or Department of Labor." Dkt. No. 106. But the record at this stage also does not reveal when the IRS investigation of the Bank commenced.

On this record, the Court finds that the Secretary has not established his right to obtain summary judgment on Count Three. The Secretary's motion on this count is consequently denied.

### IV. COUNT FOUR: HOLDING PLAN ASSETS IN NONINTEREST BEARING ACCOUNTS AT THE BANK

Count Four takes issue with the fact that defendants "chose to hold Plan cash assets in eleven separate noninterest bearing accounts at the Bank, thereby making the cash available for use by the Bank without charge." Dkt. No. 1 ¶ 75. Defendants do not dispute that they held approximately $35,539.20 "in non-interest bearing accounts," but state that on August 15, 2013, the Bank "sent checks to the Plan Participants totaling $4,801.56, which reflected the payment of interest through that date at a rate of three percent," which was "well in excess of then-prevailing market rates." Dkt. No. 102-1 ¶ 19. Mr. Chi states that this was done to "bring[] closure to this dispute, not because I believed that such payment reflected the true sum owed to the Plan Participants." *Id*. The Secretary responds that "[i]f the interest has now been paid in full, this does not obviate the breach." Dkt. No. 103 at 11.

That may be so, but the Court finds as a preliminary matter that the Secretary has failed to establish that holding Plan cash assets in noninterest bearing accounts constitutes a violation of ERISA as a legal matter. The Secretary cites to legal authorities that relate to impermissible loans, *see*, *e.g.*, Dkt. No. 103 at 11 (citing case for proposition that "repayment of prohibited loan does not make the loan lawful"), and argues that "[d]efendants' admissions are sufficient for this Court to find them liable for engaging in [a] prohibited loan between the Plan and the Bank (a party in interest)." But the Court does not find defendants' failure to hold cash belonging to the Plan and its participants in interest-bearing, rather than non-interest bearing, accounts to be analogous to a loan from the Plan to the Bank. The Secretary's summary judgment motion on Count Four is denied on that basis.

### CONCLUSION

The Court denies defendants' motion for summary judgment on Count One, and grants in part and denies in part the Secretary's motion. The issue of a remedy for Counts One and Two, as well as all issues relating to Counts Three and Four, will proceed to a bench trial to take place in November or December of 2015. The Court, however, strongly encourages the parties to meet and confer in light of this order to explore a mutually agreeable resolution of the remaining issues in this case.

1. To the extent that is not possible, the Court sets a further case management conference for August 26, 2015, at 1:30 p.m. The parties are directed to file a joint status statement by August 19, 2015, advising the Court of the remaining issues to be decided from the parties' point of view, as well as proposed pre-trial conference and trial dates, and any other ideas the parties may have for a streamlined approach to bringing this litigation to a complete resolution.

**IT IS SO ORDERED.**

Dated: August 25, 2015

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California