1  WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
   MATTHEW W. POWELL (SBN 114563)
2  DANIEL L. BAXTER (SBN 203862)
   mpowell@wilkefleury.com
3  dbaxter@wilkefleury.com
   400 Capitol Mall, Twenty-Second Floor
4  Sacramento, California 95814
   Telephone:    (916) 441-2430
5  Facsimile:    (916) 442-6664

6  Attorneys for Defendants California
   Pacific Bank, Richard Chi, Akila Chen,
7  Kent Chen, William Mo

8                UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of the United States Department of Labor,<br><br>              Plaintiff,<br><br>     v.<br><br>CALIFORNIA PACIFIC BANK, RICHARD CHI, AKILA CHEN, KENT CHEN, WILLIAM MO and THE CALIFORNIA PACIFIC BANK EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>              Defendants. | Case No. 13-CV-03792 JD<br><br>**DEFENDANTS' POST-TRIAL BRIEF**<br><br>Date:  April 29, 2016<br>Courtroom:  11 (19th Floor)<br>Judge:  Hon. James Donato<br><br>Complaint Filed:  August 15, 2013<br>Trial Date:          April 4, 2016 |

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

1436386.4                                                                 13-CV-03792 JD
                        Defendants' Post-Trial Brief

**TABLE OF CONTENTS**

**Page**

COUNT ONE: FAILURE TO DISTRIBUTE CASH UPON TERMINATION ............................... 1

    Question 1:  Whether The Secretary Has The Authority To Compel Defendants To Pay The Plan Participants More Than They Agreed To Accept. ............................... 1

    Question 1(a):  How Would The Money Be Distributed?/Are Further Orders Necessary? ........................................................................................................ 2

        Additional Issue 1:  What Date Did Interest Begin To Accrue? ............................... 3

        Additional Issue 2:  What Is The Appropriate Rate Of Interest? ............................. 5

COUNT TWO:  ALLOCATION OF THE $132,506 ACCOUNT RECEIVABLE ......................... 7

    Question 2:  What Is The Appropriate Rate of Interest? .......................................................... 7

    Question 2(A):  How Will The Money Be Distributed?/Are Any Further Orders Necessary? ........................................................................................................ 8

COUNT THREE:  TRANSFERRING $69,746 FROM THE PLAN TO BANK ............................ 9

THE RAMIFICATIONS OF WILLIAM MO'S RESIGNATION ................................................. 13

CONCLUSION ................................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Strauss Neibauer & Anderson APC Profit Sharing 401(k) Plan*,
2011 WL 149442 (E.D. Cal 2011) .................................................................................... 11

*Blankenship v. Liberty Life Assurance Co. of Boston*,
486 F.3d. 620 (9th Cir. 2007) ....................................................................................... 6, 7

*Blanton v. Anzalone*,
813 F.2d. 1574 (9th Cir. 1987) .......................................................................................... 7

*Caplan v. CNA Financial Corp*,
573 F. Supp. 2d. 1244 (N.D. Cal. 2008) ........................................................................... 5

*Conkright v. Frommert*,
559 U.S. 506 (2010) .......................................................................................................... 4

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101 (1989) .......................................................................................................... 4

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ........................................................................................................ 11

*In re Calpine Corp.*,
2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ................................................................ 12

*Jeffries v. Trustees of the Northrop Grumman Sav. & Inv. Plan*,
169 F.Supp.2d 1380 (M.D. Ga. 2001) ............................................................................ 11

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
552 U.S. 248 (2008) .......................................................................................................... 2

*Minton v. Deloitte & Touche USA LLP Plan*,
631 F.Supp.2d 1213 (N.D. Cal. 2009) .............................................................................. 8

*Nelson v. EG & G Energy Measurements Group, Inc.*,
37 F.3d 1384 (9th Cir. 1994) ........................................................................................ 5, 8

*Pettaway v. Teachers Ins. and Annuity Ass'n of America*,
547 F.Supp.2d 1 (D.D.C. 2008) ...................................................................................... 11

*Santos v. Gates*,
287 F.3d 846 (9th Cir. 2002) ............................................................................................ 4

*Tibble v. Edison Intern.*,
729 F.3d. 1110 (9th Cir. 2013), *vacated*, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015) ...... 4, 5

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ............................................................................................ 4

*Veltri v. Building Service 32B-J Pension Fund*,
    393 F.3d 318 (2nd Cir. 2004) .............................................................................................. 11

**STATUTES**

29 U.S.C. § 2509.75-8 ................................................................................................................ 12

29 U.S.C. §1109(b) .................................................................................................................... 14

29 U.S.C. §1132(a)(2) .................................................................................................................. 4

Defendants submit this Post-Trial Brief pursuant to the Court's April 5, 2016 Order (Dkt. 155).

**COUNT ONE: FAILURE TO DISTRIBUTE CASH UPON TERMINATION**

This Court ruled that Defendants were required to distribute cash rather than stock upon termination of the Plan.[1] Consequently, the only issues to be decided as to Count I are as follows: (1) the questions outlined in the Court's Order, (2) the additional interest, if any, that should be paid to the Plan Participants and (3) the date from which interest should accrue.

**Question 1: Whether The Secretary Has The Authority To Compel Defendants To Pay The Plan Participants More Than They Agreed To Accept.**

Succinctly stated, the Court first asked what legal authority the Secretary has to compel Defendants to pay the Plan Participants more than they agreed to accept as payment in full for the stock they held in the Plan. The short answer is "**None.**" There is no basis for requiring Defendants to pay the Plan Participants anything more than they agreed to accept. Nor is there any basis for the Secretary to compel the Plan Participants who did not wish to sell their stock to sell their stock.

Preliminarily, the Secretary offered absolutely no evidence that any of the Plan Participants felt that they were not fairly compensated for the stock they sold. The Parties stipulated as to the amounts paid to the Plan Participants by Alan Chi. There is no evidence that any of those Plan Participants requested a dollar more than they were paid. Conversely, Defendants presented unrefuted evidence that the Plan Participants received fair market value for their stock ($12.75) and interest at a rate that actually exceeded the market rate (see discussion below). There is absolutely no basis for unjustly enriching the Plan Participants by paying them more than fair market value for their stock.

The Secretary only disputes the payments to two Plan Participants: Yan-Hua Hou and Michael Johnson. With respect to Ms. Hou, Alan Chi testified that he negotiated with Ms. Hou regarding the purchase of the stock she held in the ESOP. Like the other Plan Participants, Ms. Hou had received

---

[1] Defendants expressly reserve the right to challenge the legal and factual determinations the Court made in granting partial summary judgment for the Secretary on Count I, including but not limited to the Court's rejection of Defendants' argument that the Secretary made it impossible for Defendants to comply with the terms of the Plan Document, and then sued Defendants because they did not comply with the Plan Document.

the letter notifying her that she could sell the stock she held in the ESOP for $12.75 a share plus interest. However, Ms. Hou wanted to sell all of the stock she held, both in her individual capacity and in the ESOP. Therefore, she and Mr. Chi negotiated an agreement pursuant to which she was paid a total of $650,000 for all of her stock. (RT 234:9-235:4; Ex. 216, p. 4.) The Secretary has no right to dictate what Ms. Hou should be paid for the stock she held outside of the ESOP. In fact, the Secretary admitted that he has no authority over the amounts paid to Ms. Hou for the stock that was not held in the Plan. (RT 36:15-18.) Consequently, Mr. Chi was not required to purchase the stock Ms. Hou held in her individual capacity, much less pay her $12.75 for that stock. The $650,000 paid to Ms. Hou was more than sufficient to compensate her for the 4,900 shares she held in the ESOP.

As for Michael Johnson, there is no question that he was satisfied with the amount he was paid for his stock. On May 25, 2012, Mr. Johnson sold 20,000 shares of stock to Alan Chi for $12.50 a share. (Ex 311; RT 231:19-232:23.) He was not paid any interest on that stock. (Ex. 216, p. 4.) The Court accepted as stipulated that Mr. Johnson was happy with $12.50 a share. (RT 154:5-14.)

The fact that the Secretary believes as a matter of principle that every Plan Participant should have received $12.75 for every share that they held in the ESOP (RT 153:16-24) does not impose a legal duty on Defendants to pay that amount. In support of its contention that it can unilaterally impose its "principles" on the Plan Participants, the Secretary cites *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008). (RT 4:5-5:18.) However, *LaRue* merely holds that a Plan Participant's individual losses can be considered losses to the Plan under ERISA Section 409. Nowhere does the case suggest that the Secretary may bring an action on behalf of Plan Participants to recover their individual losses. Even assuming arguendo that the Secretary could bring an action on behalf of the Plan Participants, that ability would not give the Secretary standing to recover any additional amounts arguably owed to the individual Plan Participants when there is no evidence that any of the Plan Participants have asserted that they are entitled to any additional money. Likewise, there is no authority that permits the Secretary to compel Plan Participants to sell their stock.

**Question 1(a): How Would The Money Be Distributed?/Are Further Orders Necessary?**

The Court next asks how the money would be distributed to the Plan assuming that the Court orders any amount to be paid to the Plan as further compensation for the Plan Participants' stock.

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

1436386.4                            -2-                            13-CV-03792 JD
Defendants' Post-Trial Brief

First, the Plan has been terminated. Second, the Plan Participants were paid in accordance with the Plan Document. They received the fair market value for their stock ($12.75) and interest at above-market rates (see discussion below). Third, the Secretary has no standing to prosecute an action on behalf of the Plan Participants (see discussion above). Fourth, if any additional interest is awarded, it should be paid to the existing shareholders, not the Plan Participants who sold their stock.

The Court asks whether it would be necessary to make any further orders about how any money to be paid to the Plan should be distributed. First, if any additional money is to be paid, the money would be paid to the existing shareholders because the Plan Participants were paid the fair market value of their stock. The Plan Participants should not be unjustly enriched because the Secretary filed this lawsuit. (See discussion at pages 8-9.) Second, if the Court orders that any additional money be paid, the Court will have to issue two orders. The first order will direct the Bank to pay the additional amounts to the existing shareholders. The second order will direct the Secretary to advise the FDIC that it must permit the Bank to make the payments to the existing shareholders. It would be unfair for this Court to issue an order directing the Bank to make these payments and then permit the Secretary to prevent the Bank from doing so.

**Additional Issue 1: What Date Did Interest Begin To Accrue?**

That brings us to the additional issues this Court needs to decide on Count I. The first issue is when interest began to accrue on the amount allegedly owed to the Plan Participants. The Secretary takes the position that interest began to accrue on June 24, 2011 when the Plan Participants received stock rather than cash in their IRA Accounts. Defendants contend that interest did not begin to accrue until January 1, 2012, one year from the date the Plan was terminated.[2]

Defendants' formulation is the correct one. Under the terms of the Plan Document, the Plan Participants were entitled to receive cash for their stock one year from the date the Plan was terminated. (Ex. 60, §10.4, p. 37.) The Plan Administrator acted in good faith and professionally,

---

[2] During trial, the Court disallowed Defendants from presenting evidence demonstrating that the Bank would have purchased the stock from any willing Plan Participants within a year of the date the Plan was terminated if the Secretary had not prevented the Bank from making such a purchase. Defendants reserve the right to challenge that ruling on appeal.

conferring with counsel and reviewing the Plan Document to make sure that his actions were fair and in the best interests of the Plan Participants. He was thereby satisfied that interest should begin to accrue on the date specified in the Plan Document. The Plan was terminated on December 31, 2010. (Ex. 216, p. 3.) One year from the date the Plan was terminated was December 31, 2011. Accordingly, interest began to accrue on January 1, 2012. (Ex. 216, p. 3.) Mr. Chi's determination that interest would not begin to accrue until January 1, 2012 is entitled to substantial deference by this Court. The Plan Document gave the Plan Administrator "discretionary authority to construe the terms of the Plan and make decisions regarding the meaning of the Plan's provisions." (Ex. 60, §8.1(b)(1), p. 35.) "[W]hen the plan grants interpretive authority to its administrator…, a deferential abuse of discretion standard applies to the administrator's determinations." *Tibble v. Edison Intern.*, 729 F.3d. 1110, 1128 (9th Cir. 2013), *vacated*, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015).[3] "If the trust documents give the trustee power to construe disputed or doubtful terms,… the trustee's interpretation will not be disturbed if reasonable." Id., at 1130, quoting *Conkright v. Frommert*, 559 U.S. 506 (2010). Under an abuse of discretion standard, the Plan Administrator's interpretation will not be disturbed if reasonable. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).[4]

---

[3] Although the U.S. Supreme Court recently issued an opinion vacating *Tibble*, the Court's decision was made on grounds unrelated to the applicable standard of review in an ERISA action. See *Tibble v. Edison Intern,* 135 S. Ct. 1823, 1825, 1829 (2015) ("The question before us concerns the application of [29 U.S.C. § 1113] to the timeliness of a fiduciary complaint.") Accordingly, *Tibble*'s holdings relative to standard of review continue to have precedential weight. The Ninth Circuit and others have taken the position that a vacated judgment retains precedential authority on those issues not addressed in the order vacating it. See, e.g., *Santos v. Gates*, 287 F.3d 846, 855 n.11 (9th Cir. 2002) (a vacated opinion "remains good law with respect" to an issue not addressed in the order vacating it).

[4] *Firestone* addressed the standard of review in the context of Section 1132(a)(1)(B) actions challenging denials of benefits. See *Tibble* 729 F.3d at 1128, citing *Firestone*, 489 U.S. at 108. However, the Ninth Circuit held that the standard of review should not only apply to Section 1132(a)(1)(B) actions "but also over claims filed pursuant to 29 U.S.C. §1132(a)(2) based on violations of fiduciary duties set forth in [ERISA §404]." *Tibble, supra*, 729 F.3d at 1128. It should also be noted that when the Secretary moved for summary judgment on Count I, arguing that the Plan Administrator violated the terms of the Plan Document when he distributed stock rather than cash to the Plan Participants, the same standard of review applied, and the Plan Administrator's interpretation of the Plan Document should not have been disturbed unless found to be arbitrary and capricious or an abuse of discretion. *Id*. at 1130; see also *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014) (footnote continued)

Since the Plan Participants were not entitled to cash for a year, interest began to accrue on January 1, 2012. As the Ninth Circuit has explained, prejudgment interest does not begin to accrue until the date the Plan Participants were entitled to money. See *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1391 (9th Cir. 1994) ("prejudgment interest is intended to cover the lost investment potential of funds to which the Plaintiff was entitled from the time of entitlement to the date of judgment"); *Caplan v. CNA Financial Corp*, 573 F. Supp. 2d. 1244, 1253 (N.D. Cal. 2008) ("plaintiff is due interest [from] the date the benefits were due to him").

**Additional Issue 2:  What Is The Appropriate Rate Of Interest?**

The second issue the Court must decide is whether the Plan Participants are entitled to any additional interest. The answer to that question is an unequivocal "**No**." The Plan Participants have already been paid interest at a rate in excess of market. The Plan Participants were paid interest at the rate specified in the Plan Document, 0.25%. As Department of Labor Investigator Ernst Williams testified, the Plan rate of return should apply. (RT 17:18-25.) That rate appears in Section 7.6 and is the rate of interest that a Plan Participant would receive if he or she put their stock to the Bank. Since this provision of the Plan Document survives the termination of the Plan, that is the rate of interest that should apply to the proceeds from the sale of stock after the termination of the Plan. (Ex. 60, §7.6(c), p. 25.) The Court made it clear that it did not feel that Section 7.6 applied in determining the rate of interest that should be paid to the Plan Participants. (RT 35:7-24, 37:25-41:16.) However, the Court is not permitted to review the provisions of the Plan Document under a de novo standard. Rather, the Court must apply a deferential abuse of discretion standard and accept the Plan Administrator's interpretation as long as it is reasonable. *Tibble*, 729 F.3d. at 1128, 1130.

Here, the Plan Administrator reviewed the Plan Document and conferred with counsel in determining the rate of interest that should be paid to the Plan Participants. The Plan Document indicates that the applicable interest rate is the rate of interest payable by the Bank on a one-year certificate of deposit. (Ex. 60, §76(a), p. 24.) This interest rate is a safe interest rate, meaning that

---

(noting that a majority of the Circuit Courts agree that there is no reason to limit *Firestone's* deferential standard to benefit claims).

there is little or no risk associated with the underlying investment because it is insured by the Federal Deposit Insurance Corporation. The higher rates of interest proposed by the Secretary are not safe rates of interest. To achieve those rates of return, the investor would have to assume some degree of risk, including but not limited to the risk that the debtor would file for bankruptcy protection. There is simply no basis for this Court to assess an interest rate that is implicitly based on a risk that the money will not be paid.

During the relevant time period, the Bank paid interest on a one-year certificate of deposit at the rate of one quarter of one percent (0.25%). (Ex 216, p. 4.) The Plan Administrator's determination is clearly reasonable, especially in light of the fact that the interest paid to the Plan Participants exceeded the market rate. More specifically, the interest paid to the Plan Participants using the 0.25% specified in the Plan Document exceeds the interest that the Plan Participants would have received if they were paid interest pursuant to 28 U.S.C. Section 1961 (hereinafter "Section 1961"). The Ninth Circuit has determined that the interest rate prescribed for post-judgment interest under Section 1961 is appropriate for fixing the rate of prejudgment interest unless the Court finds, on substantial evidence, that the equities of that particular case require a different rate. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d. 620, 628 (9th Cir. 2007).[5] From 2010 through the middle of 2015, the interest rate prescribed by Section 1961 generally was substantially less than the 0.25% prescribed by the Plan Document. In fact, there were only a couple of weeks during that four and half year period that the interest rate prescribed by Section 1961 equaled or slightly exceeded 0.25%. From the middle of 2015 through April 2016, the interest rate prescribed by Section 1961 ranged from 0.26% to 0.72%. Like the interest rate specified by the Plan Document, the Treasury Rate is a safe rate of return (i.e. little or no risk). Thus, as Exhibit "C" to Defendants' Request for Judicial Notice of Treasury Rates makes clear, if the Plan Participants were paid interest pursuant to Section 1961, they would have been paid less than they were paid by Alan Chi. In summary, the Plan

---

[5] The Secretary has conceded that Section 1961 specifies the rate for prejudgment interest "unless the Trial Judge finds, on substantial evidence, that the equities of that particular case require a different rate." (Dkt. 95: Secretary's Opposition to Defendants' Motion for Partial Summary Judgment, etc. p. 17 of 35.) The equities certainly do not require a different rate in this case.

Participants received fair market value for their stock plus interest in excess of the market rate. There is no basis for paying them any additional interest.

### COUNT TWO:  ALLOCATION OF THE $132,506 ACCOUNT RECEIVABLE

This Court has already held that $81,407.18 of the $132,506 account receivable from Seclusion Alcalde needs to be distributed to the Plan.  (Ex. 216, p. 5.)[6]  Thus, the only issues remaining are the Court's questions regarding Count II.

**Question 2:  What Is The Appropriate Rate of Interest?**

The Court first asks what the appropriate rate of interest is on the $81,407.18.  If any interest is to be paid, it would be calculated at the weekly one-year average constant maturity treasury yield (hereinafter "Treasury Rate").  As noted above, the Treasury Rate is a safe rate of return as it is based on the rate paid where there is little or no risk of losing the principal.  The Ninth Circuit has held that prejudgment interest is calculated in the same manner as post judgment interest if the Court, in its discretion, determines that prejudgment interest should be paid.  "A district court may award prejudgment interest on an award of ERISA benefits at its discretion" *Blankenship, supra*, 486 F.3d at 627.  The Ninth Circuit "has a strong policy in favor of the Treasury Bill Rate [and] any departures from it must be accompanied by a reasonable justification." *Blanton v. Anzalone*, 813 F.2d. 1574, 1576 (9th Cir. 1987).  The Ninth Circuit has also emphasized that prejudgment interest is awarded to compensate the Plan Participants, not to penalize the Defendants.  *Blankenship, supra*, 486 F.3d. at 627. The Secretary cannot present any rational basis for imposing an interest rate in excess of the Treasury Rate that is not premised on punishing Defendants for their conduct.[7]

The Court's next question is how the prejudgment interest rate is calculated.  Both the Ninth Circuit and the District Courts have indicated that prejudgment interest should be calculated using the

---

[6] Defendants expressly reserve the right to challenge the legal and factual determinations the Court made in granting partial summary judgment for the Secretary on Count II.  During trial, the Court prohibited Defendants from presenting evidence demonstrating that interest should have stopped accruing on August 29, 2013 when the FDIC denied the Bank's request to pay the $81,407.18, plus interest, to the Secretary.

[7] As the Secretary has repeatedly emphasized, there will be a separate penalty proceeding following this trial.  There, the Secretary will have its chance to demonstrate that Defendants should be penalized because the Secretary prevented them from liquidating the assets of the Plan.

Treasury Rate compounded on an annual basis. For example, the Ninth Circuit held that plaintiffs recovering benefits under ERISA were entitled to prejudgment interest "to cover the lost investment potential of funds to which the Plaintiff was entitled, from the date of entitlement to the date of judgment [at the Treasury Rate]." The interest due was calculated as though the plaintiffs had invested the withheld funds at the 52-week Treasury Bill Rate and then reinvested the proceeds annually at the new rate. *Nelson, supra*, 37 F.3d at 1391-1392. The Northern District reached the same conclusion, holding that "plaintiff is due interest equivalent to that which would have accrued if he had invested his benefits at a rate equal to the weekly average 1-year constant maturity Treasury yield on the date the benefits were due him, and then reinvested the proceeds annually at a rate equal to the weekly average 1-year constant maturity Treasury yield at the time of the reinvestment, up to the date on which Defendants satisfie[d] the judgment." *Minton v. Deloitte & Touche USA LLP Plan*, 631 F.Supp.2d 1213, 1221 (N.D. Cal. 2009). Following the clear direction of the Ninth Circuit and the Northern District, interest should be calculated from the date the cash was distributed to the Bank, June 24, 2011, at the Treasury Rate as of that date (0.16%) through June 24, 2012 and then reinvested at the Treasury Rate on that date (0.19%) and so on through June 24, 2015 when the Treasury Rate was 0.29%. The final calculation of prejudgment interest will occur when the Court enters judgment. However, through April 29, 2016, the interest due was $722.75. (See Exhibit C to Defendants' Request for Judicial Notice of the Treasury Rate.)

**Question 2(A): How Will The Money Be Distributed?/Are Any Further Orders Necessary?**

The Court then asked the following question: "How will any money paid back to the Plan be distributed and are any further orders necessary in that regard?" The answer to the first part of the question is that the $81,407.18 will not be paid to the Plan. The Plan has been terminated. The $81,407.18 should be paid to the existing shareholders. If Alan Chi had not purchased the stock held by the Plan Participants, they would not have been able to sell their stock. Alan Chi was under no legal obligation to purchase the stock held by the Plan Participants. He voluntarily purchased their stock to provide them with a safety-net in order to avoid this legal dispute. By doing so, he assumed all the risks of ownership of the stock. In this case, the risks of ownership were extremely high because there is no market for the stock and the FDIC would not permit the Bank to repurchase the

stock. As a result, the Plan Participants received $12.75 a share (well above fair market-value) and Alan Chi received stock for which there was no market along with all the risks of ownership of the stock. (RT 232:24-234:6.) Having sold their stock, the Plan Participants have no right to participate in the distribution of the $81,407.18. They should not be unjustly enriched simply because the Secretary filed this lawsuit.[8]

The second part of the Court's question is whether it needs to make any further orders. The answer is "**Yes**." The Court will need to issue two orders. The first order will direct the Bank to make the payments to the existing shareholders. The second order will direct the Secretary to advise the FDIC to allow the Bank to make the payments to the existing shareholders.

## COUNT THREE: TRANSFERRING $69,746 FROM THE PLAN TO BANK

The issue tried was "the specific time and circumstances of Defendants transfer of $69,745 from the Bank, whether the one-year time-limit under ERISA for recovering over-contributions, if that applies here, was tolled and whether the Plan sustained any compensable losses from the transfer." (Dkt. 144.) The Court now asks "which Defendants should be held liable, to what extent and why."

The short answer to that question is that none of the Defendants should be held liable. Richard Chi conferred with Brian Nash, the independent Certified Public Accountant who advised him regarding tax and accounting matters for the ESOP. Mr. Nash also maintained all of the documents for the ESOP. Both Mr. Chi and Mr. Nash testified that the $69,746 was an overpayment that should be returned to the payor—the Bank. As they explained, the $69,746 was never intended to be a cash dividend to the Plan or any of the Plan Participants. Rather, all the cash payments the Bank made to the Plan were intended to either purchase stock or pay down loans. Consequently, the fact that $69,746 remained in the Plan's deposit account after all the outstanding loans were paid off indicates that the $69,746 was an overpayment. (RT 105:22-106:9, 108:5-18, 114:5-115:2, 117:14-24, 206:6-207:9, 208:1-210:5, 213:13) It is that simple.

---

[8] The irony of the Court's decision is that it will result in Richard Chi receiving a substantial portion of the $81,407.18 (see discussion below). Throughout the entire time he was a Plan Administrator, Mr. Chi made sure that none of the transactions involving the Plan inured into his personal benefit. Instead, he made sure the transactions were fair to all the Plan Participants.

Mr. Chi and Mr. Nash also testified as to why the $69,746 overpayment was not returned to the Bank until September 2012. Their explanation begins with the audit by the Internal Revenue Service. The audit continued over the course of several years and, at the conclusion, a number of adjustments were proposed. (RT 106:10-108:1, 108:19-109:2.) As the IRS Audit was nearing conclusion, the Department of Labor ("DOL") began its investigation. (Ex. 216, p. 6.) Like the IRS, the DOL questioned a number of transactions and there was concern that further reallocations would be proposed by the DOL. As the DOL investigation ground on, Richard Chi became increasingly concerned about any transactions involving the Plan. He was reluctant to take any action lest the DOL take the position he had done something wrong. (RT 108:19-109:2, 117:14-24.)

Not until the Plan was terminated did Mr. Chi begin the process of liquidating the assets of the Plan and paying off all the remaining liabilities. During the Summer of 2011, there was still an outstanding loan to the Plan. Seclusion Alcalde had loaned the Plan $1.1 million so that it could purchase stock. (Ex 204; RT 135:15-20.) That loan was paid off during the Summer of 2011. (Ex. 74; RT 109:3-110:19.) Had it been done in the manner the Secretary contends is proper, the $16,038 would have first been returned to the Plan and then the Plan would have paid off the outstanding loan. (RT 80:14-20.) However, there is no dispute that the loan was paid off in June 2011.

Mr. Chi and Mr. Nash testified that the $69,746 was not returned to the Bank until September 2012 because Mr. Chi was hoping that the DOL would finish its investigation. (RT 118:6-13.) However, when the investigation continued into the Fall of 2012, Mr. Chi decided to return the $69,746 to the Bank. (Ex. 216, p. 5; 140:20-142:12.) When Mr. Nash became aware of the transfer, he discussed it with Mr. Chi. He found Mr. Chi's explanation reasonable based on his understanding of the purpose of the contributions which had been made to the Plan. Mr. Nash also found that returning the overpayment was consistent with the Plan Document. Finally, Mr. Nash understood that the overpayment had not been returned within one year because Mr. Chi was waiting for the DOL to complete its investigation. (RT 207:10-25, 213:13-214:14, 225:1-22.)

Defendants concede that there is not extensive documentation explaining why the $69,746 belonged to the Bank. That is because the only thing the $69,746 could have been is an overpayment. While the Secretary proposed some hypotheticals as to why there might have been additional money

in the Plan's bank account, those hypotheticals ultimately proved to be without factual support. For example, the Secretary argued that the Plan purchased stock at one point and subsequently sold the stock for $2 more than the Plan paid for it. (RT 133:12-137:12.) However, Mr. Chi explained that the additional $2 was used to pay down the outstanding loans. (RT 147:13-148:2.) As the loans were paid, the stock securing those loans was available for allocation to the Plan Participants. However, the Plan did not realize a profit on that transaction. Thus, the Secretary has not presented any evidence indicating that the $69,746 was anything other than an overpayment.

Mr. Chi and Mr. Nash provided sufficient evidence to establish that the one-year time limit under ERISA Section 403(c) for recovering overpayments to the Plan was tolled. Section 403(c) is analogous to a statute of limitations.[9] The doctrine of equitable tolling is read into every federal statute of limitations. See *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). Thus, the doctrine of equitable tolling extends to ERISA actions. See *Veltri v. Building Service 32B-J Pension Fund*, 393 F.3d 318, 322-325 (2nd Cir. 2004). And, more specifically, the doctrine of equitable tolling applies to ERISA Section 403(c). *Anderson v. Strauss Neibauer & Anderson APC Profit Sharing 401(k) Plan*, 2011 WL 149442 at *6 and *7 (E.D. Cal 2011).

The doctrine of equitable tolling applies where a plan or plan participant delays taking action because of an ongoing investigation. In this case, the DOL's investigation operated as a regulatory/administrative inquiry into the propriety of Defendants' conduct. United States district courts have repeatedly held that the pendency of administrative proceedings in general will equitably toll ERISA-based limitations periods. *Pettaway v. Teachers Ins. and Annuity Ass'n of America*, 547 F.Supp.2d 1, 5-7 (D.D.C. 2008) (applying equitable tolling while plaintiff pursued administrative appeal); *Jeffries v. Trustees of the Northrop Grumman Sav. & Inv. Plan*, 169 F.Supp.2d 1380, 1382 (M.D. Ga. 2001). Although those cases addressed the tolling of the limitations periods governing ERISA claims by plan participants against plans, there is no reason why the same rationale should not apply to toll a limitations period for the benefit of a defendant in an ERISA action. In both circumstances, tolling ensures that the parties are not forced to make precipitous—and potentially

---

[9] See Decisions Supporting California Pacific Bank's Right to Recover Over-Contribution (Dkt. 106.)

erroneous—decisions relative to the handling of funds in an ERISA-governed retirement plan.

Despite the fact that all the evidence presented at trial demonstrates that the $69,746 was an overpayment and that the overpayment should have been returned to the Bank, the Court has still raised the question of which Defendants should be held liable for the $69,746. The $69,746 was returned to the original payor—the Bank. Neither Richard Chi nor the Trustees should be ordered to return any portion of the $69,746 since they never received any portion of that sum.

That brings us to the Trustees—Akila Chen, William Mo and Kent Chen. There is absolutely no basis for holding the Trustees liable for any violations of ERISA arising from the fact that the $69,746 overpayment was returned to the Bank. The Trustees testified that they were not aware that the $69,746 was returned to the Bank until this lawsuit was filed. (RT 167:3-168:12, 178:24-179:4, 180:12-181:8, 196:5-19.) Consequently, they cannot be held liable for the decision to return the $69,746.

Nor can they be held liable for not being aware of the fact that the $69,746 was returned to the Bank. The Trustees properly delegated responsibility for overseeing the administration of the Plan to Richard Chi. The Trustees retained outside legal counsels, outside appraisers, outside certified public accountants and other outside, independent professionals as needed to review the actions of the Plan Administrator. They also met periodically with the Plan Administrator to receive updates. (RT 158:16-162:6, 162:21-164:15, 181:12-20, 187:16-189:21.) By doing so, they satisfied their duty to monitor the performance of the Plan Administrator. They were under no legal obligation to monitor every detail relating to the administration of the Plan. The duty to monitor does not go so far as to require examination of every action taken by the Plan Administrator, and is instead a limited duty. See, *In re Calpine Corp.*, 2005 WL 1431506, at * 3 (N.D. Cal. Mar. 31, 2005). All that is required of the Trustee is the following:

> [a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

(29 U.S.C. § 2509.75-8, at FR-17). Furthermore, the duty to monitor is not breached unless the

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

monitoring party has "notice of possible misadventure by [the] appointees." *Newton v. Otterloo*, 756 F.Supp. 1121, 1132 (N.D. Ind. 1991).)   The Trustees were never on notice of any "possible misadventure" by Richard Chi.

That leaves the questions of damages.  If the Court finds that the Bank is not entitled to the $69,746, then the Court should issue an order directing the Bank to distribute the $69,746 to the existing shareholders (see discussion above).  The Court should also enter an order directing the Secretary to advise the FDIC to allow the Bank to distribute the $69,746 to the existing shareholders.  That order should include a description as to how the $69,746 should be allocated.  As Mr. Chi explained, he will receive approximately forty percent (40%) of the $69,746.  (RT 118:17-25, 120:1-5.)  In the event the Court requires the Bank to pay prejudgment interest on the $69,746, the interest rate should be the Treasury Rate prescribed by Section 1961.  Using the Treasury Rate, approximately $477 in interest accrued from September 10, 2012 and through April 29, 2016.

## THE RAMIFICATIONS OF WILLIAM MO'S RESIGNATION

It is undisputed that William ("Bill") Mo submitted a letter resigning as a member of the Board of Directors of California Pacific Bank in October 2010.  (Ex. 64; RT 172:10-173:11.)  Although the letter did not expressly state that he was resigning as a Trustee of the Plan, he understood that he was resigning as a Trustee when he submitted the letter.  (RT 173:6-11, 177:23-178:5.)  More importantly, Richard Chi, the Plan Administrator, understood that Mr. Mo was resigning as a Trustee.  As Mr. Chi explained, Mr. Mo could not serve as a Trustee once he resigned from the Board.  (RT 102:10-103:7, 143:11-144:15.)  The Secretary has no answer to these undisputed facts other than to argue that the letter does not specifically state that Mr. Mo is resigning as a Trustee.

After Mr. Mo resigned as a Trustee, Richard Chi requested that he come back to execute two documents.  The first document was the resolution terminating the Plan.  The second document was the resolution demanding payment of the account receivable from Seclusion Alcalde.  Mr. Mo signed both of these documents at the end of December 2010.  (Ex. 34, 67; RT 102:10-103:7, 173:19-174:18, 175:14-177:2.)  After Mr. Mo signed these two resolutions, he had no further involvement with the Plan.  He did not attend the meetings of the Board of Directors of the Bank.  He did not have discussions with Mr. Chi or the other Trustees regarding the Plan.  (RT 173:19-174:3.)  While there

may be some question as to whether Mr. Mo's resignation was effective in October 2010 when he submitted the letter to the Board of Directors or whether it was effective when he executed the resolutions two months later, there is no question that Mr. Mo resigned and was no longer actively involved in monitoring the Plan Administrator after December 2010. Since all of the actions at issue in this litigation occurred months after Mr. Mo resigned, there is no basis upon which to hold Mr. Mo liable for any of these actions. As ERISA Section 409 makes clear, "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty…if such breach was committed…after he ceased to be a fiduciary." 29 U.S.C. §1109(b).

The fact that the Secretary is continuing to prosecute this action against Mr. Mo reveals the real motivation behind this lawsuit. The Secretary had no interest in making sure that the Plan was liquidated and the assets distributed to the Plan Participants. If the Secretary were actually concerned about the Plan Participants, then the Secretary would have worked with Richard Chi to help him liquidate the Plan instead of preventing Mr. Chi from quickly and efficiently liquidating all the assets of the Plan. The continued prosecution of this action against Mr. Mo demonstrates that the Secretary is really interested in punishing Defendants. The Secretary wants to make this litigation as unpleasant and expensive as possible for them.

Why the Secretary wants to punish Defendants is a complete mystery. This is not a situation where either the Plan Administrator or the Trustees were lining their pockets at the expense of the Plan Participants. The undisputed evidence establishes that neither the Plan Administrator nor the Trustees received any compensation from the Plan. (RT 93:9-19, 94:9-17, 162:14-20, 189:21-23.) The undisputed evidence also demonstrates that Mr. Chi did not profit personally from any of the transactions at issue. Mr. Chi owns approximately twenty-two percent (22%) of the outstanding stock of California Pacific Bank. (RT 199:18-21.) However, none of the money returned to the Bank was distributed to Mr. Chi. Further demonstrating that Mr. Chi satisfied his obligations as a fiduciary is the fact that he did not distribute any assets to the Plan that did not actually belong to the Plan. Mr. Chi owns approximately forty percent (40%) of the assets of the Plan. (RT 118:17-25, 120:1-5.) Had Mr. Chi wished to enhance his own financial position, he would have resolved all doubt in favor of allocating assets to the Plan Participants rather than the Bank. Mr. Chi would have distributed the

$81,407.18 and $69,746 to the Plan Participants and thereby receive around $60,000 in his personal IRA account.  (RT 118:17-25, 119:22-120:5, 214:25-215:6.)  Mr. Chi did not distribute these monies to the Plan Participants because he was committed to treating the Bank and the Plan Participants fairly.  Mr. Chi did not want to take any action through which he would personally profit at the expense of either the Bank or the Plan.  (RT 119:1-11, 215:7-11.)

## CONCLUSION

For the reasons set forth above, Defendants contend that the Plan Participants have received all of the money to which they are entitled for the stock they held in the Plan.  Defendants also contend that any interest that is assessed be calculated at the Treasury Rate set forth in Section 1961.  Finally, Defendants contend that the $69,746 should remain with the Bank, where it rightfully belongs.

Respectfully submitted,

DATED:  April 29, 2016

WILKE, FLEURY, HOFFELT,
GOULD & BIRNEY, LLP

By:  /s/ Matthew W. Powell
MATTHEW W. POWELL
Attorneys for Defendants