UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS E. PEREZ,<br><br>    Plaintiff,<br><br>    v.<br><br>CALIFORNIA PACIFIC BANK, et al.,<br><br>    Defendants. | Case No. 13-cv-03792-JD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

These findings of fact and conclusions of law are based on the documentary evidence and testimony admitted during the bench trial in this case, and they are made pursuant to Federal Rule of Civil Procedure 52(a)(1). Dkt. No. 154. The case was tried to the Court without a jury under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1114 (9th Cir. 2001) ("there is no right to a jury trial in ERISA cases"); *see also* Dkt. Nos. 23, 24. The Court will direct entry of judgment for plaintiff on the terms specified below.

## BACKGROUND

This is an ERISA enforcement action brought by the Secretary of the United States Department of Labor (the "Secretary"). At issue is the handling of the California Pacific Bank Employee Stock Ownership Plan (the "Plan"), which was terminated before this lawsuit was filed. Defendants are the Plan itself; California Pacific Bank (the "Bank"); and four individual fiduciaries of the Plan: Richard Chi, Akila Chen, Kent Chen and William Mo. The Bank is a small, privately-held commercial bank headquartered in San Francisco.

The Secretary's complaint alleged four claims for relief against the defendants:

| Count | Factual Basis | Alleged ERISA Violations |
|---|---|---|
| One | Failing to liquidate and distribute shares as cash upon termination of the Plan | Violations of duties of loyalty, prudence, and compliance with Plan documents, ERISA §§ 404(a)(1)(A), (B) and (D) |
| Two | Improperly diverting $132,506 account receivable | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Transfer of Plan assets to a party in interest, ERISA § 406(a)(1)(D); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing Plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |
| Three | Transferring $69,745.93 in Plan assets from the Plan to the Plan sponsor | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Transfer of Plan assets to a party in interest, ERISA § 406(a)(1)(D); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing Plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |
| Four | Holding Plan assets in noninterest bearing accounts at the Bank | Violations of duties of loyalty and prudence, ERISA §§ 404(a)(1)(A) and (B); Self-dealing, ERISA § 406(b)(1); Transaction involving a conflict of interest, ERISA § 406(b)(2); Causing Plan assets to inure to benefit of the employer, ERISA § 403(c)(1) |

Dkt. No. 1 ¶¶ 52-80.

Earlier in the case, the parties filed cross-motions for summary judgment. Dkt. Nos. 92, 95. The Court's order on those motions resolved several claims and issues. Dkt. No. 121. That order and other subsequent developments significantly narrowed the scope of the issues that remained for the bench trial. On Count One, the Court found on summary judgment that defendants breached their fiduciary duties by improperly failing to liquidate and distribute Bank shares held by the Plan as cash to participants after the Plan was terminated, as the express terms of the Plan required. *Id*. at 4-8. The Court granted summary judgment for the Secretary on the issue of liability, and the issue remaining for trial was the amount of loss, if any, that the Plan sustained as a result of defendants' breaches. Dkt. No. 144. On Count Two, the Court found on summary judgment that defendants had improperly diverted from the Plan to the Bank $81,407.18 of an account receivable that belonged to the Plan. Dkt. No. 121 at 9-11. The only remaining triable issue was the proper measure of damages for this improper transfer. Dkt. No. 144. For Count Three, both the liability and damages issues remained open for trial. Dkt. No. 121 at 12. Namely, the issues for resolution were: the specific timing and circumstances of defendants' transfer of $69,745 from the Plan to the Bank; whether the one-year time limit under ERISA for

recovering over-contributions, if applicable here, was tolled; and what compensable losses the Plan sustained from the transfer. Dkt. No. 144. For Count Four, the Court denied the Secretary's request for summary judgment and the parties subsequently reached an agreed resolution, and so nothing in that claim proceeded to trial. Dkt. Nos. 121, 144.

Prior to trial, the Secretary advised the Court that he had "decided to no longer seek injunctive relief against the Defendants in this case." Dkt. No. 142 at 3. The requests for injunctive relief in the complaint are consequently deemed voluntarily dismissed. The remaining claims and issues were few and very focused, and went to a one-day bench trial at which nine witnesses testified. Dkt. No. 154-1. The findings of fact and conclusions of law made here are based on the evidence and testimony admitted at the trial, the Court's observation of the demeanor, credibility and candor of the witnesses, and the arguments of the parties at trial and in their post-trial briefs. Dkt. Nos. 159, 161.

**FINDINGS OF FACT**

**A.    Facts Common to All Counts**

1.    California Pacific Bank (the "Bank") is a privately-held bank that focuses its business on extending credit to small, minority-owned businesses. Dkt. No. 153 ("Trial Tr.") 88:16-19, 101:20.

2.    The California Pacific Bank Employee Stock Ownership Plan (the "Plan") is an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"). Trial Ex. 216 ¶ 1.

3.    California Pacific Bank (the "Bank") is a named fiduciary and the "Plan Sponsor" for the Plan. Trial Ex. 216 ¶ 2.

4.    Richard Chi, the Bank's Chairman, President and CEO, was also a trustee and the plan administrator for the Plan. Trial Tr. 88:7-89:24.

5.    Akila Chen, William Mo and Kent Chen were the other trustees for the Plan, and all three were also on the Bank's board of directors. Trial Tr. 93:18-21.

6.    The Plan's trustees have discretionary authority and responsibility in the administration of the Plan. Trial Ex. 60 at 28 (§ 8.1(c)(2)).

3

7. The Plan was terminated on December 31, 2010. Trial Ex. 216 ¶ 3.

### B. Count One: Losses to Plan for Failure to Distribute Plan Shares as Cash on Termination

8. Section 10.4 of the Plan, entitled "Termination of the Plan," states: "Upon termination or partial termination of the Plan and Trust by formal action of the Employer . . . , each effected [*sic*] Participant shall be 100% vested in his Accounts, and payment to such Participant *shall be made in cash* as soon as practicable after liquidation of the assets of the Trust but not later than one year following the date of termination." Trial Ex. 60 at 35 (emphasis added).

9. Instead of cash distributions on termination as the Plan required, on June 24, 2011, Bank stock held by the Plan was distributed to the individual retirement accounts ("IRAs") of the Plan participants. Trial Ex. 216 ¶ 4.

10. Prior to termination, the most recent appraised value of California Pacific Bank shares was $12.75 per share (as of December 31, 2009). Trial Ex. 216 ¶ 5. The appraisal was performed by the Plan sponsor. Trial Tr. 16:20-17:5.

11. Some Plan participants later received some cash for the Bank shares that had been distributed to them. Trial Tr. 13:3-10. The cash came in the form of payments from purchases of shares made mainly by Alan Chi, Senior Credit Officer for the Bank and the son of Richard Chi, the Bank's CEO and the Plan's plan administrator. Trial Ex. 216 ¶ 6. In the fall of 2013, Richard Chi asked Alan Chi if he would be willing to purchase stock from the other Plan participants. Trial Tr. 232:24-233:2. Alan Chi's sister, Amber Chi, also made some purchases. Trial Ex. 216 ¶ 6.

12. Certain of the payments made by Alan and Amber Chi included interest for the period of January 1, 2012, through the date of purchase. Trial Ex. 216 ¶ 7. The interest rate used was .25 percent, which is the rate of interest the Bank would have paid on a one-year certificate of deposit. Trial Tr. 34:11-35:12.

13. Section 7.6(a) of the Plan provides that, "[f]or purposes of this Section a 'reasonable rate of interest' shall be the rate of interest payable by the Bank on a one-year

4

1  certificate of deposit, unless the Trustee determines that another rate is appropriate under the
2  circumstances." Trial Ex. 60 at 19-22.

3      14.    The Department of Labor uses an interest rate that is based on the Internal Revenue
4  Code Section 6621(a) when plan sponsors self-report and voluntarily correct violations of ERISA.
5  Trial Tr. 17:10-13. The Department refers to this rate as the "IRC rate." It is a variable rate, and
6  during the relevant time period, it was between three and four percent. *Id*. 18:8-21; Trial Ex. 217
7  at 3.

8      15.    The participants of the Plan can be grouped into three categories. One group of
9  participants did not sell their Bank shares to Alan or Amber Chi, and to date they have not
10 received any cash or interest for the Bank shares that were distributed to them on June 24, 2011.
11 Trial Tr. 15:20-21; Trial Ex. 216 ¶ 9. This chart identifies these participants along with the
12 number of Bank shares they received on June 24, 2011, and the principal (calculated at $12.75 per
13 share) and interest (calculated at the IRC rate from June 24, 2011 through the date of trial) they
14 should have received:

| Participant | Shares | Principal | Interest | Total |
|---|---|---|---|---|
| Henry Jia Qian Kuang | 1,549 | $19,749.75 | $3,103.88 | $22,853.63 |
| Shao Min Wang | 1,915 | $24,416.25 | $3,837.27 | $28,253.52 |
| Ivy Melissa Suryasentana | 54 | $688.50 | $108.21 | $796.71 |
| Hsiao Li Yang | 269 | $3,429.75 | $539.02 | $3,968.77 |
| Chiu Ling Chan | 38 | $484.50 | $76.14 | $560.64 |
| Allen Chiang | 11,257 | $143,526.75 | $22,556.75 | $166,083.50 |
| Richard Chi | 35,228 | $449,157.00 | $70,589.79 | $519,746.79 |
| Alan Chi | 4,381 | $55,857.75 | $8,778.64 | $64,636.39 |
| Total for Category | 54,691 | $697,310.25 | $109,589.70 | $806,899.95 |

26 Trial Tr. 19:4-20:24; Trial Ex. 217 at 2-11; Trial Ex. 216 ¶ 9.

27     16.    Another group of Plan participants did exchange their distributed Bank shares for
28 cash at the full rate of $12.75 per share, but they received interest at a rate of 0.25% and only from

5

January 1, 2012. Trial Tr. 15:22-24. These exchanges were made on different dates, all after June 24, 2011. *Id*. at 21:3-4, 23:1-4. The participants in this category and the dates on which they received some cash for their shares; and the interest still owing (if calculated at the IRC rate beginning on June 24, 2011) are:

| Participant | Date Received Some Payment | Interest Still Owing |
|---|---|---|
| Jason Yao | 10/10/2013 (3,461 shares) | $3,312.32 |
| Michael Cheng | 10/11/2013 (3,464 shares) | $3,318.83 |
| Hong Li | 10/30/2013 (245 shares) | $239.64 |
| Ann Chang | 11/5/2013 (323 shares) | $317.97 |
| Angela Shee | 12/17/2014 (349 shares) | $488.75 |
| Kevin Lee | 1/28/2015 (314 shares) | $452.81 |
| Rui Mao | 8/13/2015 (58 shares) | $95.05 |
| Michael Johnson | 5/25/2012 (20,000 shares with no interest at all) & 9/27/2013 (9,432 shares) | $17,687.42 |
| Total for Category | | $25,912.78 |

Trial Tr. 20:25-28:25; Trial Ex. 217 at 2, 12-19; Trial Ex. 216 ¶ 8.

17.  A final group of participants exchanged their Bank shares for cash, but they received less than $12.75 per share and no interest. Trial Tr. 15:25-16:1. Those participants, the amounts they received, and the amounts still owed (where interest is calculated at the IRC rate beginning on June 24, 2011) are:

| Participant (and amounts received) | Principal Still Owing | Interest Still Owing | Total |
|---|---|---|---|
| Michael Johnson (20,000 shares sold at $12.50/share on 5/25/2012) | $5,000.00 | $613.05 | $5,613.05 |
| Yan-Hua Hou (4,900 shares sold at $10.02/share on 11/12/2014) | $13,377.00 | $7,723.74 | $21,100.74 |
| Total for Category | $18,377.00 | $8,336.79 | $26,713.79 |

Trial Tr. 24:4-31:2; Trial Ex. 217 at 2, 19-21; Trial Ex. 216 ¶¶ 8, 10.

6

18.     Michael Johnson sold his shares on two different dates. On May 25, 2012, he was paid $12.50 per share and no interest on 20,000 shares. Trial Ex. 216 ¶ 8. On September 27, 2013, he sold his remaining 9,432 shares at $12.75 per share and $523.04 in interest (at a rate of .25%). *Id*. The $5,000 he was underpaid on May 25, 2012 (due to the difference in share price of $12.50 per share vs. $12.75 per share) and the related interest (calculated at the IRC rate beginning on June 24, 2011) are included in the third category; otherwise the amount of interest owing to him is included in the second category. Trial Tr. 24:4-28:25. The Court accepted as stipulated that Johnson was "perfectly happy with [the] $12.50 [price]" for his 20,000 shares. *Id*. 154:9-11.

19.     Yan-Hua Hou sold 64,900 shares for $650,000 total in a single transaction on November 12, 2014. Trial Ex. 216 ¶ 10. 4,900 of these shares were Bank shares Hou had received from the Plan as part of the termination distribution; the remaining 60,000 were Bank shares she held outside of the Plan. *Id*. Alan Chi wrote one check to Hou for $650,000 in exchange for her 64,900 shares. *Id*. This comes out to an average price of $10.02 per share. The Secretary did not dispute that he "has no authority . . . to dictate" what Hou should have been paid for the shares she held outside of the Plan; however, defendants did not present evidence in the form of documents or witnesses that Hou was in fact paid $12.75 per share for the 4,900 shares she held in the Plan and a different price for the 60,000 shares she held outside of the Plan. Trial Tr. 36:9-18. The evidence at trial was that Hou "wanted a lump sum for her shares." *Id*. 235:3-4. The Court finds that Hou was paid $10.02 per share for each of her 64,900 shares on November 12, 2014.

**C.     Count Two: Damages for Improper Transfer of $81,407.18 from Plan to Bank**

20.     Because the Court already found on summary judgment that defendants improperly diverted $81,407.18 from the Plan to the Bank (from an account receivable that belonged to the Plan), the parties agreed that what remained was for the Court to order defendants to pay $81,407.18 in damages to the Plan. Trial Ex. 216 ¶ 11. The parties also agreed that the interest, if any, that the Court determines should be paid on the $81,407.18 should be calculated from June 24, 2011, forward. *Id*.

21.     No additional factual findings need to be made for Count Two.

7

### D. Count Three: Liability and Damages for Transfer of $69,745 from the Plan to the Bank

22. At the time the Plan was terminated in December 2010, the Plan's assets included checking accounts which held cash. Trial Tr. 54:18-55:13. One of these accounts was an account with a number ending in 6510 which was held at the Bank. *Id*. 57:11-14; Trial Ex. 55.

23. Phillip Meyrose is an investigator with the U.S. Department of Labor ("DOL"), Employee Benefits Security Administration ("EBSA"). Trial Tr. 50:19-24; 51:13-15.

24. EBSA's investigation of the Plan opened in approximately May of 2008, and beginning in November 2010, Meyrose joined the investigation as the lead investigator. Trial Tr. 53:16-54:17.

25. Brian Nash is a Certified Public Accountant at Richardson and Company whom Richard Chi worked with to administer the Plan. Trial Tr. 94:20-95:12. Nash interacted with Meyrose in the course of EBSA's investigation, providing documents relating to the Plan to Meyrose on behalf of the Bank. Trial Tr. 55:21-56:6.

26. On September 10, 2012, Meyrose sent an e-mail to Nash seeking account statements from January 2011 through August 2012 for the 6510 account. Trial Tr. 56:18-57:21; Trial Ex. 55. There was a $69,745.93 balance in that account that had been there since the termination of the Plan. Trial Ex. 16; Trial Tr. 65:7-9, 69:1-70:2 ("from approximately July 2010 until September 10th, 2012 the account balance was $69,745.93.").

27. The $69,745.93 balance was transferred from the Plan's account to the Bank on September 10, 2012. Trial Ex. 216 ¶ 13. Richard Chi made the decision to make the transfer. Trial Tr. 141:6-10.

28. In a telephone conversation with Meyrose on September 12, 2012, Nash informed Meyrose that the Bank's response regarding Meyrose's request for 6510 account statements was that "there really shouldn't be anything in there, [and] there is a balance of $69k that has carried from 12-31-10 until now." Nash stated to Meyrose that the Bank planned to "backdate an entry (as of 12/31/10 or so) to suspense that account until they determine if that amount should be distributed to participants or returned to the Bank." Trial Tr. 58:12-60:2; Trial Ex. 16. Nash conveyed to Meyrose the Bank's statement that because everyone had been paid out what they

1    were owed, "that amount is an error on the loan calculation or an over contribution to pay those

2    loans; either way, the amount should be returned to [the] Bank." Trial Ex. 16.

3        29.    At no time prior to September 12, 2012, did anyone at the Bank ever claim to

4    EBSA that the Bank was entitled to the $69,745.93 in the Plan's account. Moreover, no one at the

5    Bank ever identified to EBSA any specific contribution that was believed to have been the result

6    of a mistake. Trial Tr. 66:16-67:2.

7        30.    Richard Chi testified that he believed the $69,745.93 in the 6510 account was an

8    "over-payment by the Bank," but he could not explain when, how or why any overpayment had

9    been made, or provide any facts in support of that testimony. Trial Tr. 106:1-107:23.

10       31.    Brian Nash testified that "[m]y understanding of the reason that all of those

11   contributions were made to the Plan was for principal and interest payments on the loans or there

12   was also repurchases of shares that were -- the proceeds of those were used to pay down the loans

13   [taken out by the Plan]. So it was clear to me that if the loans had been paid down and there was

14   money left over, it was really an over-contribution at some point." Trial Tr. 206:16-23; 213:16-

15   20. But he, too, could not identify any specific transaction from a specific point in time that was

16   an error or represented a mistaken "over-contribution" from the Bank to the Plan. *See*, *e.g.*, *id*.

17   214:5-6 ("*at some point* a contribution was made in excess . . .") (emphasis added).

18       32.    On October 23, 2010, William Mo submitted a letter of resignation to the "CPB

19   Board of Directors." Trial Ex. 64. It stated that, "[r]egretfully, I present my resignation as a board

20   director of California Pacific Bank." It made no mention of the Plan. *Id*. Mo testified that he

21   believed that "[w]hen you resign as the Board of Directors, [you also] automatically resign as [a]

22   trustee [of the Plan]." Trial Tr. 143:24-25. However, when asked if he had "resign[ed] as a

23   trustee," he responded that he "resign[ed] as a director." Trial Tr. 172:7-8. More significantly, on

24   December 28, 2010, Mo signed the resolution to terminate the Plan, noting his title as "Trustee."

25   Trial Ex. 34.

26       33.    Mo said he did not remember anything about the $69,745.93 that was transferred

27   from the Plan to the Bank. Trial Tr. 178:24-179:8. When asked, "for example, if [Chi] wanted to

28   transfer Plan assets from one bank account to another bank account," if that would be the type of

United States District Court
Northern District of California

thing Chi would get Mo's "approval for, or would that be too small to ask for approval," Mo responded that he did not remember "approving anything like that." *Id*. 182:9-17.

34. Kent Chen served as trustee of the Plan for about ten years. Trial Tr. 158:7-12. Describing his experience over that time, Chen testified that "there are not too many issues before the Plan termination. So usually we have a short meeting after the board meeting, Mr. Chi report to all of our trustee." *Id*. 158:24-159:1. Chen did not oversee the day-to-day administration of the Plan nor did he feel responsible for the details of the Plan; his recollection was that there were "not really too many issues."[1] *Id*. 159:12-23. Chen was "not familiar with" the $69,745.93 that was transferred from the Plan to the Bank. *Id*. 167:7-10. Chen did not receive any training for his role as trustee, and nobody explained to him his duties as Plan trustee. *Id*. 168:13-169:14.

35. Akila Chen was also a trustee of the Plan. Trial Tr. 188:6-8. When asked about his responsibilities as trustee, Chen responded, "Actually, I don't involved the detail. And when the meeting -- the board meeting, according to Mr. Richard Chi's report, everything's ok. So, I have not any question." Trial Tr. 188:9-13. When asked if he remembered Chi showing him reports from the Plan's lawyers, Tobin & Tobin, Chen's response was, "Only when Mr. Chi show me the paper, and I think that's nothing special. And it is not very important for me. So, I don't remember." *Id*. 189:13-15. Asked at his deposition if "as a trustee," he had "ever put the interest of the employee before the interest of the bank," he said "no." *Id*. 191:5-8. On the stand, he tried to walk this back by saying that "I'm the trustee, I have to protect the employees' benefit. Also, I have to protect the bank's interest, profits, too." *Id*. 190:5-9. He testified in his deposition that "I don't like to getting involved in to the detail, the Plan's detail," and there were "[n]o meeting[s]. No special meeting for this plan." Trial Tr. 193:8-10, 193:19-20. Chen also testified that he received "no training" for his role as trustee; he believed "[t]he most important job duty for me is watch the bank's security and profit. That's my job"; and he did not believe that he was the "right power to check" the $69,746 that was transferred from the Plan to the Bank. *Id*. 194:18-20, 195:12-13, 196:10.

---

[1] One witness testified through a Chinese language interpreter. Others appeared not to be native speakers of English. The transcript reflects these factors.

**CONCLUSIONS OF LAW**

  **E.**  **Legal Standards**

  36.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), is invoked by the Secretary for each of the remaining counts before the Court. It requires fiduciaries of ERISA plans to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." Our Circuit has described these fiduciary duties as being among the "highest known to the law," *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996), and they include the duty of loyalty, duty of prudence, and duty to act in accordance with plan documents. 29 U.S.C. § 1104(a)(1)(A), (B), (D).

  37.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), empowers the Secretary to bring a civil action "for appropriate relief under section 1109 of this title [*i.e.*, ERISA § 409]." ERISA § 409(a) provides that, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ."

  38.  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), provides that a co-fiduciary can be liable for the "breach of fiduciary responsibility of another fiduciary with respect to the same plan" in certain situations, including if, "by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach."

  **F.**  **Count I: Losses to Plan for Failure to Distribute Plan Shares as Cash on Termination**

  39.  The main legal question for this count is whether the Secretary has adequately explained why the deficient cash or interest distributions to certain Plan participants were "losses to the Plan" under ERISA § 409(a). *See* Dkt. No. 155. The Secretary has made this showing.

  40.  As the Court held on summary judgment, the Plan expressly required distributions to be made in cash to participants upon termination of the Plan. Dkt. No. 121 at 6. In violation of this clear requirement, the participants got Bank shares rather than cash. *Id*. Receiving illiquid

11

Bank shares rather than cash amounts to a loss for the participants of the Plan. As Richard Chi testified himself, "We are a privately-held bank. The shares of the bank has no any outside value. Nobody will buy the shares of the small community bank." Trial Tr. 101:20-22. Under the circumstances of this case, the losses suffered by the individual Plan participants should be deemed "losses to the Plan" under ERISA § 409(a). *See LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 255-56 (2008).

41. Whether Michael Johnson or Yan-Hua Hou were "happy" to sell their Bank shares for less than the appraised value of $12.75 per share is irrelevant to the question of loss. Happiness is not a recognized exception to the plain terms of an ERISA plan, and defendants failed to provide any basis in the case law or statute that would excuse compliance on that ground. Defendants also never raised or even mentioned a waiver defense, but even if so construed, they did not show waiver by Johnson or Hou. Defendants did not adduce facts showing that Johnson and Hou knowingly and voluntarily waived their rights to receive the full benefits they were due under the Plan. There was, for example, no evidence at all about Johnson or Hou's "education and business sophistication," the "roles of employer and employee in determining the provisions of the waiver," or "the time [participants] had to study the agreement." *Upadhyay v. Aetna Life Ins. Co.*, Case No. C 13-1368 SI, 2014 WL 186709, at *4 (N.D. Cal. Jan. 16, 2014) (citation omitted).

42. On the issue of interest, the Court first finds that there is no rate of return specified by the Plan. Although defendants presented evidence of a "rate of interest" specified in Section 7.6(a) of the Plan, that rate relates to put options for participants who received a distribution of Bank stock because they elected that option under Section 7.2. Trial Tr. 32:12-34:10; Trial Ex. 60 at 21-22. That rate has no application to the facts of this case, where Plan participants were distributed Bank shares in violation of Section 10.4, Termination of Plan, which clearly states that upon termination of the Plan, "each effected Participant shall be 100% vested in his Accounts, and payment to such Participant shall be made in cash . . . ." Trial Ex. 60 at 35.

43. The Court has discretion to award prejudgment interest in this ERISA case. *Blankenship v. Liberty Life assurance Co. of Boston*, 486 F.3d 620, 827 (9th Cir. 2007). "Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is

1  appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial

2  evidence, that the equities of that particular case require a different rate." *Id*. (internal quotations

3  omitted). "Prejudgment interest is an element of compensation, not a penalty." *Dishman v.*

4  *UNUM Life Ins. Co. of America*, 269 F.3d 974, 988 (9th Cir. 2001). "Although a defendant's bad

5  faith conduct may influence whether a court awards prejudgment interest, it should not influence

6  the rate of the interest." *Id*.

7      44.    Here, the equities support an award of prejudgment interest. Defendants' conduct

8  was in blatant disregard of the express terms of the Plan document and of the defendants' fiduciary

9  duties under ERISA. Dkt. No. 121 at 7-8. The Court also finds that the equities of this case

10  support the imposition of the higher IRC rate advocated by the Secretary rather than the 28 U.S.C.

11  § 1961 rate advocated by defendants.

12      45.    There is no dispute that the § 1961 rate would be lower than the IRC rate. *See* Dkt.

13  No. 159 at 6 ("From the middle of 2015 through April 2016, the interest rate prescribed by

14  Section 1961 ranged between 0.26% to 0.72%."); *see also* Dkt. No. 161 at 4 n.2 ("The § 1961 rate

15  has ranged from 0.09% to 0.69% since June 24, 2011."). The Secretary has submitted evidence

16  that the IRC rate, on the other hand, was between 3 and 4% during the relevant time period, and

17  that is the rate the Secretary uses for plan sponsors who self-report and voluntarily correct

18  violations of ERISA. Trial Tr. 17:10-13. That, of course, did not happen here -- defendants still

19  show scant understanding of the fiduciary breaches they have committed, let alone taken voluntary

20  responsibility for them. The Court agrees with the Secretary that to use the significantly lower

21  § 1961 rate in a case like this one would produce an inequitable result, as it would effectively

22  result in a windfall for defendants who have neither self-reported nor voluntarily corrected. Dkt.

23  No. 161 at 5. The Court finds this to be substantial evidence that supports the use of the IRC rate

24  in this case. *See*, *e.g.*, *Solis v. Sonora Environmental, L.L.C.*, Case No. CV 10-00675-TUC-JGZ,

25  2012 WL 5269211, at *5-6 (D. Ariz. Oct. 24, 2012).

26      46.    As the start date for interest, the Court sets January 1, 2012, and not June 24, 2011.

27  The loss being made good here is the participants' failure to receive the cash they were entitled to

28  receive under Section 10.4 of the Plan. Trial Ex. 60 at 35. That Section required a distribution in

13

cash to be made by "not later than one year following the date of termination," which in this case was December 31, 2010. *Id.*; Trial Ex. 216 ¶ 3. There is no good reason to start calculating interest from a date earlier than the last date the participants could theoretically have received their cash distributions in accordance with the Plan. Interest will consequently be calculated from January 1, 2012, forward for all three of the categories identified by the Secretary for Count One, and not from June 24, 2011, which is the date on which participants received distributions in Bank shares (and is the beginning date the Secretary proposes to use).

47. The facts show ample basis to impose joint and several liability on all four individual fiduciary defendants: Richard Chi, Akila Chen, William Mo and Kent Chen. As the Court's summary judgment order stated, Richard Chi sent a letter to Plan participants on March 1, 2011, which was "replete with misinformation" and showed "an utter disregard . . . for the rights and interest of the participants." Dkt. No. 121 at 7. Chi is also the person who declared that "the Bank stock held by the Plan was distributed to the IRA accounts of the Plan participants on or about June 24, 2011," *id.* at 5, and likely the person who made the decision that those distributions should be made. The Court finds that Chi is liable for the resulting losses to the Plan under ERISA § 409(a) ("[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from such breach").

48. The Court finds that Akila Chen, William Mo and Kent Chen should also be held liable under ERISA §§ 409 and 405. As an initial matter, the Court rejects William Mo's resignation defense. The evidence showed only that he had resigned as a board member, not as a trustee of the Plan. His resignation letter itself made no mention of the Plan, and he continued to act as a trustee, including signing without notation the termination resolution for the Plan as one of its trustees. Among other things, this was inconsistent with the Plan's requirements for resignation as a trustee. *See* Trial Ex. 60 §§ 8.1(c)(1), 8.6 (requiring written notice of trustee resignation to Bank with effectiveness date not less than thirty days from date of notice unless agreed otherwise); *see also Pension Benefit Guaranty Corp. v. Greene*, 570 F. Supp. 1483, 1497

(W.D. Pa. 1983) ("Under ERISA, a trustee must be held to have continued in a fiduciary status absent a clear resignation").

49. As a trustee, Mo failed in his duties, as did Akila Chen and Kent Chen. The testimony of each of these trustees showed that they did not understand or appreciate their responsibilities as fiduciaries of the Plan, and they provided little or no oversight of Chi. These trustees failed to fulfill their fiduciary responsibilities, and by doing so enabled Chi to commit this breach. 29 U.S.C. § 1105(a)(2); *see also In re First American Corp. ERISA Litig.*, 258 F.R.D. 610, 623 (C.D. Cal. 2009) ("[A]s a matter of law, fiduciaries can be liable for breach of their fiduciary duties even if they did not know of [another defendant's] malfeasance, so long as they could have known about it had they acted 'with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.'"); *Free v. Briody*, 732 F.2d 1331, 1336 (7th Cir. 1984) (fiduciary cannot "avoid liability for [another trustee's] mismanagement of the Plan by simply doing nothing."); *Russo v. Unger*, No. 86 Civ. 9741 (CSH), 1991 WL 254570, at *7 (S.D.N.Y. Nov. 20, 1991) ("the law requires more from a fiduciary than blind faith in another fiduciary's integrity."). In addition to being liable as co-fiduciaries under ERISA § 405(a)(2), the evidence supports a finding that Akila Chen, William Mo, and Kent Chen are also liable in their own rights under § 409 for the breaches of their own fiduciary duties under §§ 404(a)(1)(A) and (B).

### G. Count II: Damages for Improper Transfer of $81,407.18 from Plan to Bank

50. The only remaining question for this count is the interest that should accrue on the $81,407.18 that was improperly transferred from the Plan to the Bank. The parties agree that the interest should be applied from June 24, 2011, forward.

51. As previously stated, the IRC rate, and not the 28 U.S.C. § 1961 rate, is the appropriate rate to apply.

52. The Court finds that all defendants should be held liable jointly and severally for the same reasons as for Count One.

**H.     Count III: Liability and Damages for Transfer of $69,745 from the Plan to the Bank**

53.     There is no dispute that $69,745 was transferred from the Plan to the Bank on September 10, 2012, and that Chi made the decision to make this transfer.  On its face, this is a prohibited transaction under ERISA § 406(a)(1)(D).  *See* 29 U.S.C. § 1106(a)(1)(D) (prohibiting fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan").  By engaging in this transaction, Chi and the Bank also violated ERISA § 406(b)(1) (fiduciary prohibited from dealing with plan assets in fiduciary's own interest or for fiduciary's own account); § 406(b)(2) (fiduciary prohibited from acting in any transaction involving the plan on behalf of a party whose interests are adverse to the plan or its participants or beneficiaries); § 403(c)(1) (assets of a plan never to inure to benefit of any employer and to be held for exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan); and § 404(a)(1)(A) and (B) (fiduciaries' duties of loyalty and prudence).

54.     Defendants failed to prove up their argument that the transfer was justified because it was a return of an over-contribution made "by a mistake of fact" under ERISA § 403(c)(2)(A)(i).  The only evidence defendants offered was their conclusory and self-serving testimony that the account balance "must have been" an over-contribution; there was no actual credible and specific evidence showing what mistake was made, when, or how.  This is plainly insufficient.  *See*, *e.g.*, *British Motor Car Distributors, Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374-75 (9th Cir. 1989) (rejecting employers' theory that "the fact that the Trust terminated (having paid off all beneficiary claims) with surplus assets of approximately $950,000 proves that the Trust fiduciaries' actuarial projections were mistaken" and constitutes "mistake of fact" under § 403(c)).  A true "mistake of fact" occurs when there is an arithmetic or clerical error in making contributions, *see id*., and no such error was ever identified here.

55.     Because defendants failed to establish that the $69,745 was an over-contribution made by a mistake of fact in the first instance, the Court has no occasion to consider whether or

16

1  not the one-year time limit for recovering such over-contributions under ERISA § 403(c)(2)(A)(i)
2  was tolled or not.
3      56.    The Court finds that the other three trustees are jointly and severally liable for this
4  count as well for the same reasons above.
5      57.    The Court also finds that it is equitable to award prejudgment interest at the IRC
6  rate from September 10, 2012 forward, in addition to the $69,745.93 in principal, for the same
7  reasons as for Counts One and Two.

## CONCLUSION

Based on these findings of fact and law, the Court orders:

<u>COUNT ONE:</u>

1. Defendants jointly and severally to pay to the Plan principal and interest as specified below (and to be distributed consistent with this chart):

| Participant | Shares To Be Collected | Principal To Be Paid | Interest To Be Paid |
|---|---|---|---|
| Henry Jia Qian Kuang | 1,549 | $19,749.75 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Shao Min Wang | 1,915 | $24,416.25 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Ivy Melissa Suryasentana | 54 | $688.50 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Hsiao Li Yang | 269 | $3,429.75 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Chiu Ling Chan | 38 | $484.50 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Allen Chiang | 11,257 | $143,526.75 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Richard Chi | 35,228 | $449,157.00 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Alan Chi | 4,381 | $55,857.75 | To be calculated at IRC rate from 1/1/12 through date of judgment |
| Jason Yao | -- | 0 | Interest at IRC rate on $44,127.75 from 1/1/12 through 10/10/13; interest at IRC rate on $35.52 from 10/11/13 through date of judgment; less $195.85 interest already paid on 10/10/13 |

| Participant | Shares To Be Collected | Principal To Be Paid | Interest To Be Paid |
|---|---|---|---|
| Michael Cheng | -- | 0 | Interest at IRC rate on $44,166.00 from 1/1/12 through 10/11/13; interest at IRC rate on $39.50 from 10/12/13 through date of judgment; less $196.33 interest already paid on 10/11/13 |
| Hong Li | -- | 0 | Interest at IRC rate on $3,123.75 from 1/1/12 through 10/30/13; interest at IRC rate on $8.10 from 10/31/13 through date of judgment; less $14.29 interest already paid on 10/30/13 |
| Ann Chang | -- | 0 | Interest at IRC rate on $4,118.25 from 1/1/12 through 11/5/13; interest at IRC rate on $1.36 from 11/6/13 through date of judgment; less $19.01 interest already paid on 11/5/13 |
| Angela Shee | -- | 0 | Interest at IRC rate on $4,449.75 from 1/1/12 through 12/17/14; interest at IRC rate on $0.51 from 12/18/14 through date of judgment; less $32.95 interest already paid on 12/17/14 |
| Kevin Lee | -- | 0 | Interest at IRC rate on $4,003.50 from 1/1/12 through 1/28/15; interest at IRC rate on $2.22 from 1/29/15 through date of judgment; less $30.79 interest already paid on 1/28/15 |
| Rui Mao | -- | 0 | Interest at IRC rate on $739.50 from 1/1/12 through 8/13/15; interest at IRC rate on $0.37 from 8/14/15 through date of judgment; less $6.66 interest already paid on 8/13/15 |
| Michael Johnson | -- |  | Interest at IRC rate on $375,258.00 from 1/1/12 through 5/25/12; interest at IRC rate on $136,780.45 from 5/26/12 through 9/27/13; interest at IRC rate on $21,608.54 from 9/28/13 through date of judgment; less $523.04 interest already paid on 9/27/13 |
| Michael Johnson | -- | $5,000 | Interest at IRC rate on $5,000 from 5/25/12 through date of judgment |
| Yan-Hua Hou | -- | $13,377.00 | Interest at IRC rate on $13,377 from 11/12/14 through date of judgment |

18

2. The Plan administrator, Richard Chi, to distribute the cash to participants in exchange for their Bank shares. The Plan administrator is advised to comply with all provisions of the Internal Revenue Code in making the distributions.

3. The Plan administrator to follow current best practices per the Secretary's guidance for locating and contacting any missing participants. For any Plan participant who still cannot be located, the Plan administrator should distribute cash into an individual retirement account or annuity in that participant's name. Existing IRAs in that participant's name may be used for this purpose.

COUNT TWO:

1. Defendants jointly and severally to pay $81,407.18 to the Plan, plus any interest at the IRC rate from June 24, 2011, to the date of entry of judgment.

2. The Plan administrator to distribute this amount to the former participants of the Plan according to the amounts in their Plan accounts at the time of termination.

3. The Plan administrator to follow current best practices per the Secretary's guidance for locating and contacting any missing participants. For any Plan participant who still cannot be located, the Plan administrator should distribute cash into an individual retirement account or annuity in that participant's name. Existing IRAs in that participant's name may be used for this purpose.

COUNT THREE:

1. Defendants jointly and severally to pay to the Plan $69,745.93 in principal and $7,865.39 in lost interest at the IRC rate through April 4, 2016, plus additional prejudgment interest at the IRC rate through the date of judgment.

2. The Plan administrator to distribute this money to participants in the same manner ordered for Count Two above.

**IT IS SO ORDERED.**

Dated: October 24, 2016

_____
JAMES DONATO
United States District Judge

19